**MARKS & KLEIN, LLP**
63 Riverside Drive
Red Bank, NJ 07701
T: (732) 747-7100
F: (732) 219-0625
Gerald A. Marks Bar No.27212-1971
*Attorneys for Plaintiff Priti Shetty*

FILED & RECEIVED #1

2015 FEB 17 P 3: 35

CIVIL OFFICE
MIDDLESEX VICINAGE

| | |
|---|---|
| PRITI SHETTY | : SUPERIOR COURT OF NEW JERSEY<br>: MIDDLESEX COUNTY<br>:<br>: LAW DIVISION |
| Plaintiff, | :                 **MID-L- 00963-15**<br>: |
| vs. | : DOCKET NO. MID-L- |
| DUNKIN'DONUTS FRANCHISED RESTAURANTS, LLC, a Delaware Limited Liability Company, BASKIN-ROBBINS FRANCHISED SHOPS, LLC, a Delaware Limited Liability Company and WAYNE MILLER, individually, | :     **COMPLAINT AND**<br>:     **JURY DEMAND** |
| Defendants | |

Plaintiff Priti Shetty (hereinafter "Priti Shetty" or "Priti") by and through her attorneys, Marks & Klein, LLP, set forth the following Complaint and allegations against Defendants Dunkin Donuts Franchised Restaurants, LLC, a Delaware Limited Liability Company, Baskin-Robbins Franchised Shops, LLC a Delaware Limited Liability Company (hereinafter collectively referred to as "Dunkin") and Wayne Miller, individually.

### NATURE OF THE ACTION

1. This action involves systematic racial discrimination by Dunkin' Donuts against its own franchisees, specifically those who are Asian Indian women of color.

1

2. Dunkin' Donuts knowingly discriminates against Asian Indian women of color, who are in protected classes under federal and New Jersey State law, and who invest in Dunkin's franchise system, only to have Dunkin discriminate against them, treat them unfairly and take adverse action against them based solely on their ethnicity, race and gender.

3. Dunkin, upon information and belief, does not sell single locations but rather requires the purchase of a Strategic Development Agreement or "SDA" to develop three or more Dunkin stores.

4. Plaintiff Priti Shetty is a female of Asian Indian descent, who pursued her entrepreneur hopes of developing three Dunkin' stores, only to have her best efforts thwarted by Dunkin' and its representatives.

5. During the course of her business relationship with Dunkin, Priti was personally victimized by, Dunkin's discriminatory policies and harassment at the hands of Dunkin's operations managers, which conduct is typical of Dunkin's discrimination against not only Asian Indian females but against all women of color.

6. Upon information and belief, Dunkin ***does not have any*** Asian Indian women multi-unit franchisees, in New Jersey, New York, Connecticut and Rhode Island.

7. Dunkin's refusal to give the Asian Indian women the same opportunities available to white or male franchise developers in the New York regional area constitutes improper racial steering in violation of both Federal Civil Rights and State anti-discrimination laws.

8. Dunkin's discriminatory actions with respect to Priti Shetty violated §1981 of the United States Civil Rights Act (42 U.S.C.) as well as the New Jersey Law Against Discrimination (N.J.S.A. 10-5-1 *et. seq.*).

9. As set more fully set forth herein Priti Shetty, as an Asian Indian American woman of color was deprived of her equal rights under both federal and state law.

10. Economic empowerment is the pathway to equality and barriers to obtaining equal franchise opportunities are an incarnation of yesterday's discriminatory policies in employment, housing and education.

11. As far as Asian Indian women are concerned, Dunkin's slogan should be "Dunkin runs on Discrimination" rather than "American runs on Dunkin".

## THE PARTIES

12. Plaintiff Priti Shetty is a former franchisee of Defendants Dunkin and resides in Montville, New Jersey.

13. Dunkin' Donuts is a Delaware corporation, with corporate headquarters located in Massachusetts that is duly authorized to conduct business in the New Jersey and New York. Dunkin' Donuts offers Strategic Development Agreements (SDA's) to establish franchise multiple locations to develop and operate Dunkin' Donuts shops.

14. Defendant Wayne Miller is a representative of Defendant Dunkin' Donuts and a resident of the State of New Jersey. At all relevant times Wayne Miller was an authorized representative of Dunkin' Donuts and was acting in that capacity. As such any liability of Miller should be imputed to Dunkin' Donuts based upon his activities as an authorized agent.

15. Venue is proper in Middlesex County as Defendants Dunkin and Miller transact business in Middlesex County.

## DUNKIN'S DISCRIMINATION AGAINST ASIAN INDIAN WOMEN OF COLOR

16. Dunkin's refusal to give Plaintiff Priti Shetty the same franchise opportunities made available to other franchise developers constitutes improper and illegal racial steering,

harassment and discrimination in violation of both Federal Civil Rights and New Jersey laws against discrimination.

17. Upon still further information and belief, of the over 6990 Dunkin franchises, less than five (if that many) are owned by Asian Indian women of color.

18. Dunkin's improper actions also are contrary to the minority franchise inclusion programs as established by both the MinorityFran Committee of the International Franchise Association and the Multicultural Foodservice & Hospitality Alliance – organizations in which Dunkin *is ironically a member*. Thus, Dunkin's conduct blatantly contravenes the established protocol of the franchise community to provide equal opportunities to all prospective and current franchisees.

## Plaintiff Shetty's Claims of Discrimination

### Dunkin's Bad Faith Refusal to Permit Shetty to Open Third Store Location

19. As a New Jersey resident, Priti Shetty and two male partners, one of whom was strictly an investor and the other who was to be a co-manager with Priti, purchased a Dunkin SDA (Strategic Development Agreement) to open three Dunkin locations in New Jersey.

20. An SDA is a multi-unit franchise development agreement in which Dunkin grants the right to open a number of Dunkin franchised locations within a designated geographic area.

21. Priti and her partners opened two Dunkin stores first in Wantage in 2004 and then in Oakridge in 2005, New Jersey, pursuant to a three-store SDA that was entered in with Dunkin in 2003.

22. After opening the initial two locations, Priti sought to open a third location in Stockholm, New Jersey in 2007 after her managing partner left the business because of stress related issues.

23. The economics of owning Dunkin franchises is to have at least three locations so that overhead costs can be absorbed by the multiple locations and yield a profit to the franchise owners.

24. To impede the ability of a franchisee to reach the minimum three location number is, upon information and belief, relegating the franchisee to, at most, barely profitable conditions which is the reason most male franchisees own more than three locations.

25. After expending significant time and resources in 2007 to finding and opening a third franchise location in Stockholm, New Jersey, Priti was falsely told that the third location she chose was unsuitable because a "drive-thru" window could not be installed.

26. Despite Dunkin's agents' representations to Priti that it would assist her in finding a suitable third location—in accordance with Dunkin's obligations under the SDA neither Dunkin, nor its representatives, including but not limited to Defendant Miller, actually assisted Priti to find, nor did they suggest the availability of, a viable, alternative location in her designated territory under the SDA, and her growth strategy was forced to flounder.

27. Disturbingly, *the very same location* that Dunkin', by and through its authorized representatives, refused to allow Plaintiff Shetty to open, based upon its purported unsuitability, was later approved for a male franchisee several months later – *without a "drive-thru" window*, which was the basis for which Dunkin' rejected Priti Shetty's choice of this particular location.

### Dunkin's Authorized Representative's Verbal Harassment and Unfair Treatment of Priti Shetty

28. Despite fulfilling all system requirements such as training employees, keeping up store cleanliness, and properly observing Dunkin's operational standards, Priti was repeatedly harassed by Dunkin's Operational Manager Wayne Miller ("Miller"). At all relevant times, Miller was acting as an authorized representative of Dunkin' in his regular course of duty.

29. Upon information and belief, all of the harassment, and non-cooperation to find a third location, occurred after Priti's male operating partner discontinued his operations role and while she continued to manage both the Wantage and Oakridge stores.

30. Miller's periodic, and excessive, inspections of both the Wantage and Oakridge locations was fraught with tension and stress for Priti. Miller was acting at all relevant times in his authorized capacity as a Dunkin' Donuts representative while he was harassing and discriminating against Shetty.

31. During a number of such inspections, discriminatory anti-female remarks were made to Priti and witnessed by Priti's store manager and other employees.

32. Miller's comments and remarks to Shetty were often derogatory and offensive, and were, upon information and belief, racially motivated. For example, Miller would typically make derogatory remarks to Shetty such as "this business is not for [you]" and would verbally berate Priti's employees, most of whom were Asian Indian.

33. Miller stated to Priti on more than one occasion, that since she was a woman and a mother of a small child so there is no way she could competently handle the store's operation.

34. On one particular occasion, despite being advised that Priti was unavailable to come to the location for an inspection because her daughter was sick (*the store at the time was being supervised by a manager*), Miller threatened to "fail" the location unless Shetty physically came to the Oakridge location to participate.

35. Miller's actions were clearly in bad faith and aimed at harassing and punishing Priti, since it was (and is) at all relevant times established Dunkin' protocol that a store owner *need not be present* for every store inspection.

36. Despite properly handling numerous store inspections and promptly curing any documented issue, Miller insisted that Priti had "a long way to go to manage an expandable network." This conversation occurred after Dunkin had approved and Shetty had already opened and operated her first store in December 2004 and her second store one year later in June 2005).

37. On another occasion Miller threatened Priti saying that if he chose to he could create many problems for her store "from nothing."

38. Miller seemed particularly irked by the fact that Priti, an accomplished business analyst and information technology professional with two college degrees (one in physics and the other in engineering) was not "servile enough" for him as compared to his stereotypical view of Asian Indian females who routinely work as employees in Dunkin stores.

39. When Shetty found a proposed third location, Miller, and another Dunkin' representative, John Panzer (Dunkin Development Manager) both came to a location she had chosen and flatly rejected the proposed location, stating that it did not have a drive-thru. *This same site was later given to a male franchisee without the requirement of a drive-thru window.*

40. Miller also required, without cause or justification, insisted that Shetty keep her store open twenty-four hours, despite the fact that remaining open for twenty four hours was dangerous because of crime in the area at night and did not make economic sense as was evidenced by Priti's daily sales figures, this unreasonable and unfair requirement was also made by Dunkin (by and through Miller) over Shetty's valid protestations that she feared for her own safety and the safety of her employees.

41. In response to these concerns, Dunkin's manager told Priti: "Why not tell Sandesh (her husband) to stand at the counter at night?" indicating again that as a woman Priti she was not competent to operate the Dunkin' location.

7

42. The twenty four hour operations issue was not changed until one of Priti's employees was attacked during the late nighttime hours and the shopping center landlord insisted that because of criminal incidents in the center, the Dunkin store not operate during the night hours.

43. Recognizing that she would continue to be thwarted by Miller and could not achieve the economies of scales by opening a third location, Priti and her partners decided to sell the two existing locations and get out of the Dunkin business, which they did in March 2010.

44. Curiously, upon information and belief, the purchaser of both of Priti's stores, a white woman by the name of JoAnne Jedd, would never keep the store open after official closing hours and often closed at 8PM.

45. However, unlike Priti, the new white female owner, JoAnne Jedd, was never reprimanded or threatened by Dunkin' or any of its representatives about closing early or not staying open until 11:00 PM or later.

46. JoAnne Judd failed and abandoned both stores nine months later in December 2010.

47. Dunkin would not let Priti Shetty resume operations as a franchisee in both of the locations causing the premises to become vacant and the landlord to sue Priti, as a guarantor of the lease, for rent.

**Discriminatory Refusal to Permit Priti Shetty Re-Purchase of Failed Locations**

48. Moreover, when the JoAnne Jedd failed in the same two locations that Priti had successfully managed for several years, Dunkin refused to let her come back and operate the stores *by herself* on the false and discriminatory basis that she had not been a good operator.

49. In fact, at the time of the sale of both stores in March 2010 to JoAnne Jedd, Priti Shetty and her partners were Dunkin franchisees in good standing and categorized as "able to expand".

50. As Priti was a guarantor on both leases for JoAnne Jedd's two failed stores, Dunkin's discriminatory decision not to let her resume operations caused her to sustain economic damages in that she now has to defend a suit commenced by her former landlord for unpaid rent for the empty store.

51. The two locations which were abandoned by JoAnne Jedd, and subsequently by Dunkin, when it refused to let Priti Shetty resume the franchise locations that she had run successfully for five consecutive years before.

52. In spite of the five year success of the Wantage and Oak Ridge stores, Dunkin falsely wrote that Priti's operation of the two stores for that period of time were "not in compliance" and further indicated Dunkin's anti-Asian Indian female prejudice by accusing her of "not being the right person to run the stores" because she "did not like the business" which was totally at odds with emails sent by Priti to Dunkin that she "loved the business" but was upset by her harassment by Dunkin managers.

### COUNT I
### RACIAL STEERING -CIVIL RIGHTS VIOLATIONS 42 U.S.C. §1981
### (AS TO ALL PLAINTIFFS)

68. Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs of this Verified Complaint with the same force and effect as though fully set forth at length herein.

69. 42 U.S.C. §1981 provides for "equal rights under the law" and prohibits racial discrimination.

70. Despite operating two profitable locations, Priti Shetty's request to open a third location in Stockholm, New Jersey was unreasonably rejected after she told Dunkin she would be solely responsible on her own for operating the store.

71. The flimsy excuse used by Dunkin for its refusal to approve the third location was that the store would not be able to service customers without a drive-thru window.

72. *This same Stockholm location, however, was eventually sold to a male, and to date operates without a drive thru window.*

73. The discriminatory nature of this refusal is further reinforced by the fact that Priti Shetty was regularly subjected to harassment and unfair treatment (as previously describe above) at her other two Dunkin locations by her Operational Manager Wayne Miller and other Dunkin managers who regularly berated Priti (and her female Asian Indian employees) and threatened to fail Priti's stores on inspections without cause and repeatedly told Priti because she was an Asian Indian woman, she was not able to run a Dunkin location.

74. Dunkin also refused to let her re-open the two franchised stores that failed after nine months of operation by a white operator – after she had successfully operated the locations for five years - because she is an Asian Indian American female.

75. Based upon these discriminatory business practices, Dunkin has violated 42 U.S.C. §1981.

## COUNT II

**NEW JERSEY LAW AGAINST DISCRIMINATION, N.J.S.A. 10:5-1 et seq.**
**DISCRIMINATORY REFUSAL TO DO BUSINESS**
**(On Behalf of Plaintiff Shetty)**

10

76. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of the Verified Complaint with the same force and effect as though fully set forth at length herein.

77. The NJ LAD prohibits discriminatory refusals on the basis of race, national origin, color and sex, by making it unlawful:

> For any person **to refuse to** buy from, sell to, lease from or to, **license, contract with,** or trade with, provide goods services or information to, or otherwise do business with **any other person** on **the basis of race,** creed, **color, national origin,** ancestry, age, **sex,** gender identity or expression, affectional or sexual orientation, marital status, civil union status, domestic partnership status, liability for service in the Armed Forces of the United States, disability, nationality or source of lawful income used for rental or mortgage payments of such other person or of such other person's spouse, partners, members, stockholders, directors, officers, managers, superintendents, agents employees, business associates, suppliers or customers.

[N.J.S.A. 10:5-12(l)] (emphasis supplied)

78. Section 12(l) of the NJ LAD prohibits refusals to do business with independent contractors (as opposed to employees) based on age, sex, or handicap. See, e.g., JT's Tire Service, Inc. v. United Rentals NA, Inc., 411 N.J. Super. 236 (App. Div. 2009); Nini v. Mercer County Cmty. Coll., 406 N.J. Super. 547, 557 (App. Div.) certif. granted, 200 N.J. 206 (2009); Rubin v. Forest S. Chilton, 3rd Mem'l Hosp., Inc. 359 N.J. Super. 105, 110-11 (App. Div. 2003) (prohibiting discriminatory termination of a contract); Horn v. Mazda Motor of Am., Inc. 265 N.J. Super. 47, 63 (App. Div.) certif. denied, 134 N.J. 483 (1993)).

79. Plaintiff Priti Shetty, as a Dunkin franchisee/developer, entered into a written contractual relationship (SDA) with Defendants and is entitled to protection from race, color, national origin or gender based discrimination under Section 12(l).

11

80. Defendants, together and in concert, knowingly refused to do business with Plaintiff Shetty based upon her race, national origin, color and sex by (i) consistently permitting its agent to make derogatory, harassing and threatening statements to Plaintiff Shetty and advising her that females were incapable of competently operating Dunkin stores and (ii) refusing to permit her to open a third Dunkin location in Stockholm, New Jersey without cause or justification and subsequently permitting a male franchisee to open the same location.

81. Defendants' conduct in the aggregate constitutes a violation of NJ LAD, Section 12(l).

## PRAYER FOR RELIEF

Plaintiff seeks both equitable relief and money damages in an Order:

a. Declaring and Adjudging that Defendants have violated 42 U.S.C. § 1981.

b. Declaring and Adjudging that Miller was acting in his authorized capacity as a Dunkin' Donuts representative while harassing and discriminating against Shetty;

c. Declaring and Adjudging that Dunkin' Dunuts is vicariously liable based upon the doctrine of *respondiat superior* for all of Miller's actions complained of herein;

d. Enjoining Defendants from continuing its discriminatory policies against Asian Indian American women and other minority franchisees and prospective franchisees and requiring Defendants to immediately implement a program of minority incentives to encourage investment by Asian Indian American women and other minority franchisees

e. Requiring Defendants to implement a "Remedial Damages" program or programs to foster and assist Asian Indian American female franchise ownership in economically advantageous areas, which would be monitored for compliance and efficiency by an

appropriate Human Rights agency or company designated by the Court, the cost of which will be borne exclusively by Defendants.

f. Compensatory Damages;

g. Consequential Damages;

h. Punitive Damages;

i. Attorneys fees and Costs;

j. Any other relief this Court deems equitable and just.

MARKS & KLEIN, LLP

BY: _____
GERALD A. MARKS
Attorneys for Plaintiffs

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury as to all issues raised by this pleading.

## DESIGNATION OF TRIAL COUNSEL

Gerald A. Marks is hereby designated as trial counsel for the within complaint.

_____
GERALD A. MARKS
Attorney for Plaintiff

## CERTIFICATION OF NO OTHER ACTION PENDING

It is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of my knowledge or belief. I know of no other parties that should be joined in the above action and recognize the continuing obligation to file and serve an amended certification if there is a change in the facts stated in this original certification.

Dated: February 11, 2015

_____
GERALD A. MARKS
Attorney for Plaintiffs